Case No. 2, Number 23-1325P, Jeketra Bryant v. Calvary Christian School of Columbus, Georgia Yes, Your Honor. Good morning, Your Honors, and may it please the Court, Seth Forden appearing on behalf of Appellant Jeketra Bryant. This case, including the party's briefing in this appeal, is absolutely packed with disputes of material fact that need to be sorted out by a jury, including conflicting testimony, issues of credibility. Tell me the conflicts that the district court didn't sort out in your comments' favor. Certainly, Your Honor. So, I think, yes, Your Honor. A lot of summary judgment cases come with a huge amount of factual disputes. Yes, Your Honor. But traditionally, what the district court is supposed to do is view all those conflicts in favor of the non-moving party. And so, what didn't the district court resolve in your client's favor on the factual side? Well, Your Honor, I mean, I could start with the district court's finding that Ms. Bryant's request for an accommodation for CB was a request to lower Calvary standards, which I think really colored the entire decision. It was not a request to lower standards, and it was, in fact, a request to give CB the assistance he needed to get up to those standards. And that's a factual finding on the court's part that, you know, first of all, I think really has no basis, and second of all, sort of tips the balance. She was asking the school to do something it normally did not do, right? Yes, but not in terms of the enforcement of its disciplinary code. I don't think she was saying, let my son misbehave and we'll do nothing about that. No, you're right about that, but she also needed to have the person in the room, in the classroom with him at all times, or most of the time, to make sure that he didn't misbehave. Yes, Your Honor. For a short duration, and it was, there was testimony by the ABA therapist that this would be minimally impactful, that the therapist would, you know, that they knew how to do this in a way that was not impactful, that the therapist would draw back over time. And this could be done in as little as a month. And those, whether that's reasonable, right, whether that is a reasonable accommodation or not, is the kind of thing that a jury should really dig into. And wasn't that actually in the discovery school's guidelines where they did mention that you could have an ABA therapist come in and sit with the child as long as that person was on an approved list? Yes, Your Honor. And I think, you know, look, I understand that there are a lot of arguments here about the jury burden on the school to have this particular therapist come in. But you're right. So the discovery program actually sets out first that it specifically caters to students with autism. Second, that, you know, ABA therapy is an appropriate way to deal with that. Third, the school itself told her to seek out an ABA therapist and come up with a plan. And that's what she did. Is there an argument that she did it to me? I think that's their argument, Your Honor. But that doesn't really make a lot of sense. I mean, there's no time limit here. He was out of the classroom. And so he could easily, you know, come back in. We can try this therapy. If it doesn't work, revisit it. But they never tried it. And the therapy was, you know, in terms of impact on the school, I mean, I'll just add the therapy was free to them. Ms. Bryant went as far as to have her insurer, right, certify that they would pay for it. And, you know, so for all those reasons, I think a jury was entitled to, you know, there's enough evidence here that a jury can look at it and say, we think this was reasonable. Or at least we think it was reasonable to try. And, again, it could be revisited. Yes, Your Honor. Certainly, Your Honor. It's a private school. There's a difference, right, in the requirement between a private and a public school. And a private school has to make what? What is it called? Minor adjustments, right? Correct, Your Honor. How do you define it? See, I'm thinking if it goes to the jury, is there a non-circuit case that says minor adjustment is one, two, three. There, unfortunately, is not, Your Honor. We will be the first to do that. You're going to be the first if you want to take that on, Your Honor. Doesn't that make a big difference? Because it's a huge difference between a private school, what we require a private school, and a public school. It is. And I understand somewhere in the brief someone said the facts, the child is doing okay in another school now, right? Yes, Your Honor. This has been a while. Yes, Your Honor. That's actually a good thing. Is he in a public school or in a private school? He's not. He has attended a private school to start with. That's what's in the record, and now he's in a different school. Did he make minor adjustments? Or did he make any adjustments because he doesn't even know these things? Did make adjustments, Your Honor. In fact, provided him with a certified special education teacher as well as a small classroom environment. And there's also evidence in the record that CB, although he's not able to do the classroom environment therapy, did do that work with Ms. Williams in the clinic setting. And so there were accommodations made. There was additional therapy being done. But I do want to address... We reverse, send it to a jury. What does a trial judge tell them about minor adjustments? Just leaves it like that. Even reasonable doubt we're defined somehow. That's right, Your Honor. What do we say as a district judge? So I would say a few things, Your Honor. One, I would strenuously disagree with Calvary's position that minor adjustments somehow excuses them from the reasonableness requirement. Reasonable accommodation is a standard that is widely applied in Section 504 cases. It's applied to universities. It's applied in employment. It's applied to the administration of Medicaid. And at least at the circuit level, it's been applied to private schools. So, but I want to give Your Honor a little guidance. I see that I'm getting, you know, a little short on time. But I want to draw your attention to Section 34 CFR Section 104.39, which is the private education standard and regulation. And, you know, of course, Calvary points to 104.39A, which says, you know, that a recipient that provides education, et cetera, et cetera, may not exclude a qualified handicapped person if the person can, with minor adjustments, be provided an appropriate education as defined in 104.33B1 within that recipient's program or activity. Okay, so that's the minor adjustments language. And I think we're all clear that it hasn't been defined, certainly, in this circuit. But you also have to read subsection C, which says, each recipient to which this section applies is subject to the provisions of 104.34, 104.37, and 104.38. And this is really the model that the Bishop case that we cited in our reply brief takes, and essentially says, you know, you have to look at all of these regulations in conjunction. And I'll just, I just want to point you to one of those, that's 104.34, which says, a recipient to which this subpart applies shall educate or shall provide for the education of each qualified handicapped person, et cetera, et cetera. I'm sorry. A recipient shall place a handicapped person in the regular educational environment operated by the recipient, unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of, and this is a key phrase that Bishop, for example, cites, the use of supplementary aids and services cannot be achieved satisfactorily. And then there are other requirements as well. So the regulations, although they do use this somewhat undefined term, minor adjustments, do not leave courts without guidance. They say there are specific concrete requirements that you have to meet, including 104.34. So I think that's, you know, that is kind of my primary point on. In the time you have left, could you touch upon the otherwise qualified issue? Certainly, Your Honor. So otherwise qualified, right, has been repeatedly held to mean, can meet the standards of the program with or without accommodation. And I think that makes sense, right, because as the Fifth Circuit pointed out, in case I don't have the name in front of me, but it's in our brief, you know, to hold otherwise would mean essentially that, you know, any impediment that a disabled person can't get around, you know, however minor and however ancillary to the process, would just mean disabled people can't access that program at all. So that just can't be the rule, right, that you have to already be able to do it without accommodation. If you can do it with accommodation, then you are entitled to use that program, and the program, if it can accommodate you, you know, under the reasonableness standard, taking all the facts into account, needs to do it. In a case like this, both of those prongs sort of collapse into one another? Which prongs, Your Honor? I'm sorry. The reasonableness of the accommodation and the student being otherwise qualified. I think as a rough thumbnail, that's fair to say, Your Honor, that, you know, obviously with or without accommodation doesn't mean with or without any accommodation. You know, the Hunt case that Calvary cites and some others, you know, where the accommodation is over the top and it's kind of impossible for the student to really participate. That's one thing. And I think that's why this goes to a jury, right, because we are talking about reasonableness and because it's not so facially unreasonable that the court should take it away from the jury. And I did want to just circle back very quickly. And, well, no, I'll leave that alone. I'm sorry. Do Your Honors have any other questions? What do we do with the racial issue that has been raised? Certainly, Your Honor. I think we can resolve America's racial issues in one minute, Your Honor. Certainly, I would say that that even more so seems to me to rest on, you know, really weighing of the evidence. The function of the jury, you know, requires people to require a jury to sort out the meaning of utterances taken in context, right. By the students. By the students, but also by the staff. Put your hands behind the back. That's right. That's right. So, I mean, to the extent that that needs interpretation, I think it needs interpretation by, you know, 12 members of the community who can look at, you know, what is the overall racial context in our community. That's right, Your Honor. That's right. I appreciate that. Yes, Your Honor. So it looks to me like the parties agree that there were four instances of throwing objects by CB. And then there's this informal behavior log that has more that you'd like us to disregard. But what about the email from Headmaster Cohn that lists some others? Well, Your Honor, I mean, we haven't necessarily briefed evidentiary issues, but I would say, you know, an email is probably not going to come in, right. It's hearsay. Mr. Cohn is free to testify about, you know, however many incidents he wants. But the, you know, the ones that made it into the official log, the actual school's official records, right, that's just three incidents. And does that make a difference to your otherwise qualified argument? Well, I think if we take the entire picture into account that, so there's this incident that is in the informal log in September 2019. And then after that, after there's an implementation of, you know, some of the initial accommodations, CB gets better, right. And then there is, I think, an issue where all of this stuff kind of comes together, right. There's this sort of racially tense environment. There is a new classroom with a teacher that, you know, I think we would say certainly there's some problems with. So the stress level goes up, these behavioral manifestations come back. And that's when he needs therapy. Thank you. Thank you, Your Honor. All right. Thank you. Thank you, Your Honor. May it please the Court. My name is Jeff Daniel, and I represent APHELE, Calvary Christian School of Columbus, Georgia, Inc., which operates Calvary Christian School, a private general education secondary school that has strict disciplinary standards. After Ms. Bryant, the appellant, sued Calvary because she claims that Calvary singled her son, CB, out under those disciplinary policies. And she's brought three main categories of claims, authority to accommodate claim under Section 504, disparate treatment claims under 504 and Section 1981, and a hostile educational environment claim under Title VI. The district court correctly granted summary judgment on all those claims, and this Court should affirm. I will begin with the 504 accommodation claim. As Your Honor has correctly noted, there is a big difference between the accommodation standards required of a private general education school like Calvary and a public school system. A public school system must provide a free, appropriate public education to a child with disabilities, no matter how severe the kid's disabilities are. And that is in the regulations under 104.33. And that severity, the no matter how severe standard, I think that largely informs what the minor adjustment standard is. Because the no matter the severity language does not appear in the private school regulation under 104.39. The private school regulation just provides that the private school must provide an appropriate education to the student as long as it can do so by making minor adjustments to. Give me some examples of minor adjustments as opposed to that would be permissible versus a public school, private school. Give me some examples so that we can figure out. Sure, Your Honor. In this case, let's take what Calvary did for CB. CB had underwent a psychological evaluation from Dr. Weiss. Dr. Weiss recommended and suggested a number of accommodations that Calvary might provide. And then Calvary provided those in his student support plan. Extended time on tests. Award bank when possible, depending, or an answer bank when possible, depending on if it's appropriate for that type of test. Preferred seating. And also encouraged a more sort of positive intervention approach to any sort of issues that might arise, behavioral issues, that sort of thing, rather than relying on punishment. And that's what the record evidence is, that that's the kind of, that's the way Ms. Cameron and this other teacher approached the situation. But isn't there conflicting evidence on that? Ms. Bryant says the accommodations were, that Ms. Cameron did not make those accommodations, and Ms. Cameron says she did. Why isn't that a genuine issue of material fact for the jury? Well, I mean, to begin, Ms. Bryant is not a member of the classroom. Ms. Bryant's not the one who's sitting in the classroom observing. She's not in a position to say whether Ms. Cameron was trying to rely on the more positive, more lenient treatment. Were all of those she asked in her deposition what the basis of her knowledge was? Your Honor, I do believe I asked for her basis for that knowledge, and she provided no basis for disputing Ms. Cameron's testimony. Certainly not enough to create a genuine material dispute of that fact in the record for the jury's consideration. And Ms. Cameron, I mean, it's very clear. Your Honor yourself pointed out that there were a number of disciplinary issues that arose with C.V., but the ones that landed in hot water were the four acts of property destruction. And those four acts of property destruction, I mean, that was too much for Calvary's disciplinary standards because they created an unsafe learning environment. They put other students at risk and staff at risk. They disrupted the classroom environment, and they were harmful to the overall sense of classroom security. And this really is not in dispute. If you look at paragraphs 42 through 44 of Calvary's statement of material facts, it covers this basis and why the headmaster, Jim Cohn, who is the critical decision maker in this case, why he felt that C.B.'s actions warranted dismissal here. And he explained that these are the reports he received, that children were frightened by these outbursts, and he thought they were harmful to the overall sense of classroom security. And also, this sort of stuff is not common at Calvary. There is no dispute of those facts. The request to have C.B. have an ABA therapist with him in the classroom, the Discovery School guidelines say, quote, the most frequent professionals visiting our campus are working with our students on the autism spectrum using ABA therapy. How is what Ms. Bryant requested different from that? Because that seems to be my adjustment, if it's something that lasts a long time. It's a matter of degree, Your Honor. And Calvary is a fan of using ABA therapy where it might possibly be indicated. But there's a far cry from having an ABA therapist visiting, pulling a student out for 30 minutes or an hour or something like that and providing some ABA services on the side, and then having a one-on-one behavioral shadow in the class, following him around throughout the day, providing hand-on-hand services to the child, constantly intervening when a problem of behavior arises, having to specially train other classroom personnel on how to intervene in those issues, how to monitor that type of intervention for ongoing success. Is it working? Is it not working? Is it too much? Is it too little? If we want to wean them off, then when do we do that? Well, that's what ABA services consist of, and that's the type of stuff that Ms. Williams describes in her deposition testimony, the kinds of things that ABA services would provide. I made the point you made about what CB was requesting being materially different from what was in the guidelines. Well, the guidelines don't say anything about a one-on-one behavioral shadow. That is an intensive behavioral intervention, even in a public school setting, and it's not something that a public school would resort to without it being a database decision by a team of IEP team members who have subject matter expertise special to that kid's individualized needs. So you're going to have a lot of people with a lot of special experience that make that decision, and then if they were to decide that a one-on-one behavioral shadow was appropriate for that kid's individualized needs, then it would be subject to ongoing refinement, data collection, that sort of thing. And at some point, that is not a minor adjustment. That's not something that Calvary's Discovery School Program provides just because it is saying, hey, there might be some kids who have learning differences, including something like autism spectrum disorder, and it might be appropriate to try to incorporate some ABA services. But that's a far cry from saying we're going to have a one-on-one specialist come in and shadow a student throughout the day so that they... The brief is that he didn't have, CB did not have one of these plans, right? A 504 plan or an individualized plan. He did not, Your Honor. And quite frankly, his mother was adamant in her deposition that he did not need a 504 plan or an IEP, which would be the typical mechanism that a public school would use to provide those types of services. In fact, the public school probably could not provide a one-on-one behavioral intervention or one-on-one behavioral shadow without it being an IEP team decision, because under the IDEA, there's a mainstreaming requirement. You have to provide a free, appropriate public education in the least restrictive environment possible. And providing a one-on-one shadow, I mean, it's not all positives. There are a lot of harms potentially associated with that if it's not appropriate for that kid's needs. Kids might not learn to self-regulate when they do have a problem behavior. They might become dependent on having this third person there. As the child gets older, the third person can kind of result in a little bit of a stigma with other children. How many students were in CB's class in general? I believe under 10, Your Honor. These were smaller classroom sizes, but importantly, not special education personnel. Calvary doesn't provide special education services. And I'll say... Your Honor, let me make that pretty clear. But the sizes were smaller in this setting. Certainly, and that's... They were for the rest of the school. And that is the Discovery School Program is part of the services and programs that Calvary provides. And what they're talking about is, you know, very much dramatically changing how those services are provided, how the classroom programming is administered. And the regulation that they hang their hat on, they talk about Section 104.39 subsection C. Well, if you actually read what the statutory, what the regulatory language says, it says a recipient to which the section applies that provides special education shall do so in accordance with the provisions that he discussed. Calvary doesn't do that. There are private schools that provide special education services and specialize in it. Take the Marcus Autism Center here in Atlanta. It caters specifically to children who have autism spectrum disorder and in all its different forms, all its different shades and varieties. And there's a world of difference between somebody on one end of the spectrum and somebody on the other end of the spectrum. On another note, that has been raised about the racial issues in the comments. Do they say anything about that? Do we say anything about the comments end up behind... What about the students? That has nothing to do with this case. What do we do with that? It seems to me like an undertone that there's some issue about that and not being notified of the soccer practice. What do we do with that? Ignore it? Or how do we work it in? I think for the most part, you can ignore it outright, Your Honor. That is part of the hospital educational environment claim under Title VI. And to do that, they have to show that there's some sort of educational environment harassment that is objectively pervasive and severe, not just merely subjectively offensive to Ms. Bryant or to CB. It has to be something that is objectively pervasive and severe. And there are standards of this fact that this Court uses under the Mendoza factors that we cite in our brief. You'd look at the frequency and severity of it, whether you're talking about something that's... Of course, most of those cases are employment cases with adults, right? Do we do anything different? Well, it provides a useful framework, Your Honor, and this Court has looked to employment case law as a guidance in some of these educational contexts. Because quite frankly, it's kind of hard to find a lot of hospital educational Title VI claims in these K-12 settings. But you can still look to the Title VII framework, recognizing, of course, that the standards we tolerate of adults in the workplace are far less than what we would accept for children in a K-12 setting. Because children are immature. They engage in silly behavior that we would not tolerate in the workplace. So with that qualification, you can still look to the Mendoza factors of a Title VII case to get an appropriate framework. And the record evidence they point to of alleged harassment just doesn't qualify as objectively severe and pervasive. You're talking about... First off, I mean, they look at alleged statements by the faculty, which, honestly, I don't know what to make of these. You're talking about statements that seem to be rooting for CB, statements that where one professional told Ms. Bryan how much she liked her and welcomed her as part of the Calvert community. A lot of positive statements. It's hard to see how those would be offensive in the first place. So the negative statements, I mean, if you're looking at just the alleged statement of the students, there were a couple of statements attributed to a couple of students during the fall of 2020. And I think something to the effect of these two students said something like, God hates blacks, or blacks are gays, or something stupid and ignorant like that. I don't recall the exact phrasing. But, yes, that is offensive. That's inappropriate. That's unacceptable. And we sure hope that... Yeah, and we hope that those children will grow and mature and become better people down the road. But it's not objectively severe and pervasive enough to trigger liability. These are infrequent remarks. They're not remarks that have... that are physically intimidating. Certainly not the threats of death and lynching that we see in the cases that they cited in their appellate brief. And there's no evidence to suggest that these student remarks were interfering with CB's academic performance. He made good grades. The problem wasn't his grades. The problem was his problem behaviors and him creating an unsafe classroom environment. And that's what was too much. And they've admitted that that is what Headmaster Cone considered to be problematic, and that's why Headmaster Cone primarily decided that he needed to be dismissed. On the 1984 putting aside the hostile educational environment claimed under Title VI, can the headmaster's comments about CB finding himself with his hands tied behind his back, could a reasonable jury view those comments as being racially offensive? No, Your Honor. Can the headmaster say where he found them as being racially neutral? No, Your Honor. And first of all, the headmaster is not the one who's alleged to have made those comments. What they're saying is Pam Jones being the person who made those comments, and she oversaw the discovery school program. And it was a comment that to the effect of, you know, worried that if he does engage in these behaviors out in the real world, he could find himself with his hands behind his back. Again, I understand that Ms. Bryant considered that to be offensive. But the fact remains, if you engage in problems like that, you know, outbursts and throwing objects around in the real world, you can get in trouble for that. I wager to say that if I started having an outburst and throwing objects around this courtroom, the U.S. Marshals might have something to say about that. So to sit there and say that a school official expressing a concern about that is evidence of racial animus, I don't think a jury could find that. And plus, that was not by the headmaster who was the key decision maker in this case. I see that my time is up. Unless Your Honors have any further questions for me, I'll be seated. Thank you very much. I'm ready. Okay. Got two minutes. Most important thing I want to point out is, I'm sorry, but Calvary's reading of Section 104.39c is just wrong. There are two sentences in subsection c. The first says, the recipient to which this section applies that provides special education shall do so in accordance with .34 and .36. And there is a second sentence that says, each recipient to which this section applies, this section being 104.39, that means private schools, each recipient to which this section applies is subject to, it says no wiggle room there, the provisions of Sections 104.34, 104.37, and 104.38. So I just want to make that point. Regarding minor adjustments, I just heard my colleague say that that is a matter of degree, which sounds to me like it basically, you know, is something that should be fed into the reasonableness analysis. When does it go too far to be minor? And I think, you know, a trial court with careful guidance from this court can certainly craft a jury instruction that will take that into account. What was the proposal made by Ms. Bryant with regard to the ABA therapist? It was for how many hours a day for how long on a test run basis? Yes, Your Honor. So it was, that's right. So it was 15 hours a week, and it was the exact length that it would take would be unclear, but the therapist thought it could be done in as little as a month. So was that three hours per day, or? That's right, Your Honor. One day, two hours one day, and four hours the third day? I think it's probably three hours per day, but, you know, I'm sure that she would have been willing to work with the school on how best to do that. My time is up, so unless there are other questions, I'm happy to yield. Thank you very much. Thank you, Your Honor.